Filed 3/4/26  In re N.J. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.J., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>B.M.,<br><br>Defendant and Appellant.<br><br>M.J.,<br><br>Respondent. | F089442<br><br>(Super. Ct. No. JD146339-00)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kern County.  Susan M. Gill, Judge.

Erika A. Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Kendra L. Graham, Interim County Counsel, and Ana M. Ovando, Deputy County Counsel, for Plaintiff and Respondent.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Respondent M.J.

The Kern County Department of Human Services (department) filed a juvenile dependency petition on behalf of five-year-old N.J. and her two younger siblings due to the failure of their mother, B.M. (mother) to adequately supervise the children and substance abuse issues, and the children were detained from mother's custody. Shortly thereafter, N.J. was placed out of county with her nonoffending and previously noncustodial father, M.J. (father).

The juvenile court sustained the dependency petition, and at the disposition hearing, declared N.J. and her siblings dependents. N.J.'s siblings were returned to mother on family maintenance services, as mother had taken steps to ameliorate her substance abuse issues. As to N.J., however, the juvenile court found she was situated differently from her siblings and was at risk of substantial danger in mother's custody because of a previous referral alleging N.J. was sexually abused by her siblings' father, J.S. The referral was deemed "inconclusive" by the department and not part of the jurisdictional allegations, but the reports indicated law enforcement had begun an investigation. N.J. was removed from mother's custody and ordered to remain in father's care on family maintenance services, with mother receiving reunification services.

Mother appeals from the dispositional order removing N.J. from her custody pursuant to Welfare and Institutions Code[1] section 361. She contends the juvenile court's factual findings underlying the order were not supported by sufficient evidence. She asserts the court erred by relying on the sexual abuse allegations because they were not pled nor proven as part of the dependency petition and doing so violated state dependency statutes as well as her constitutional rights to due process.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2.

Mother also contends the juvenile court's finding that the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA)[2] did not apply to the proceedings was error.

The department does not oppose mother's contentions regarding removal, as it argued for return of N.J. to mother below.  It does argue, however, that the juvenile court did not err by finding ICWA inapplicable.

While this appeal was pending, this court named father a party and appointed him counsel.  Father contends the removal order and ICWA findings were proper.

Finding no error, we affirm the juvenile court's dispositional findings and order.

## FACTUAL AND PROCEDURAL BACKGROUND

The department became involved with this family in September 2024.  Mother, N.J., and N.J.'s two younger half-siblings had been living with the maternal grandparents for about three months.  N.J.'s siblings' father, J.S., was living in a sober living facility, but he and mother were an intact couple, and J.S. had plans to move in with mother and the children.  Father lived in Orange County and did not have regular contact with mother or N.J.

One evening, while mother was cooking dinner, she heard N.J.'s infant sibling I.S. vomiting.  When mother went to check on I.S., I.S.'s body went limp, and she became unresponsive.  The maternal grandfather called 911, and upon arrival, paramedics suspected fentanyl ingestion.  I.S. was taken to the hospital and tested positive for fentanyl.

Law enforcement investigated, and the department received a referral.  During the investigation, mother was not initially forthcoming with information but eventually disclosed that her parents were longtime fentanyl users and admitted she knew they were

---

[2]    "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

still using. Fentanyl was found in the grandparents' bedroom, and empty alcohol containers were found in a pile of laundry in the bedroom mother shared with the children. The maternal grandfather admitted the fentanyl was his and that mother knew of his use. None of the adults in the household knew how I.S. got a hold of the fentanyl.

Mother also admitted to being a prior fentanyl user but said she had not used for a few years. She had been residing in a sober living home for 11 months before moving in with the maternal grandparents. She told the social worker she thought they were sober and had no idea they were using despite earlier telling law enforcement she knew of their current use.

Mother was arrested for child endangerment. Law enforcement advised the social worker that there was a previous referral from March regarding possible sexual abuse and stated there were concerns that the alleged perpetrator might still be living in the home.

N.J. was detained and placed in foster care.

Father was contacted and reported he had been living in Orange County for four years. There were no custody orders in place; he had been trying to get visitation through family court but was having trouble serving mother because he had lost contact with her. It had been a few years since he had seen N.J. He had a history of alcohol abuse but had been sober for four years and had never used drugs. He was active in church and was employed as a case manager/supervisor at a behavioral health facility. He lived in a two-bedroom apartment with his fiancée and had two teenage children who occasionally stayed with them. He missed N.J. and wanted her to live with him.

The department filed juvenile dependency petitions on behalf of N.J. and her siblings. As for N.J., the petition alleged she came within the court's jurisdiction under

section 300, subdivision (b)(1) because mother's failure to adequately supervise or protect and her substance abuse put N.J. at risk of harm.[3]

The department's detention report included a child welfare referral from March 2024 alleging sexual abuse of N.J. by J.S. N.J. had reported to her grandparents and mother that on one occasion when mother, N.J., and J.S. were staying in a motel and slept in the same bed, she woke up with J.S.'s "finger in her 'tiktik' referring to her vagina." Mother reportedly questioned N.J. approximately seven or eight times then called the police. Mother missed two scheduled SART exams but eventually took N.J. to the exam. N.J. also underwent a forensic interview where she disclosed that J.S. "snuck in and advised he is the only one allowed to touch her 'tik tik,' vaginal area" but was unable to provide details. She also mentioned a rash and domestic violence. Law enforcement was unable to complete an interview with J.S. At one point during the investigation, J.S. was incarcerated due to domestic violence allegations, but it was reported the investigating officer was off duty and could not complete the interview while J.S. was in custody. Mother declined services and advised the children would not be unsupervised with J.S. in the future. In May 2024, the department deemed the referral inconclusive and was not in possession of a law enforcement report because law enforcement was still conducting its investigation. It was noted the department had requested the police contact the department once their investigation was complete.

At the detention hearing on September 23, 2024, the juvenile court declared father to be N.J.'s presumed father. Father's attorney advised that father would be asking for placement and wanted visitation to start as soon as possible. J.S. was declared N.J.'s siblings' presumed father and requested visitation with N.J. The court ordered visitation between N.J. and her parents and reserved visitation orders between N.J. and J.S. until

---

[3]     It was also alleged that N.J. came within the court's jurisdiction under section 300, subdivision (g) because mother had been arrested without providing for N.J.'s care, but that allegation was ultimately dismissed.

N.J.'s attorney was able to ascertain her wishes. The court made temporary detention orders from mother and continued the matter at mother's attorney's request, as she was at a hearing for her criminal case.

At the continued detention hearing on September 25, 2024, the court granted the department discretion to place N.J. with father and ordered the children detained from mother. J.S. again requested visitation with N.J. N.J.'s attorney noted, "[t]here are some very strong allegations against [J.S.] in the report" but because "he has had a living relationship with her for the last five years and nothing has been substantiated yet," he would "not oppose supervised visitation." He admitted he had not spoken to N.J. yet, and the court gave the department discretion to allow visits between N.J. and J.S. "taking [N.J.]'s wishes into account." County counsel advised that the social worker was "attempting to get in contact with the detective that was involved in this investigation just to get further information. But given the allegations, that's our concern until we get further information."

Mother began engaging in voluntary services including substance abuse and parenting services. She visited with the children, and the children expressed sadness at the end of visits and stated that they wanted to be with mother.

The department reported it was not exercising its right to use discretion to allow visits between N.J. and J.S. because "there was an active ongoing law enforcement investigation." Later, however, it was reported that mother and J.S. attended visits together with all three children, including N.J.

Father began visiting with N.J., and the two formed a close bond. Father's home had been assessed with no safety concerns, and he had no criminal or CPS history in Orange County and had tested negative for all substances. N.J. reported wanting to live with father.

The department's jurisdiction report dated November 6, 2024, included the same information as the detention report regarding the March 2024 referral alleging sexual

abuse deemed inconclusive. It was again reported that the department was not in possession of a law enforcement report, as law enforcement was still conducting the investigation.

The department's initial recommendation was that N.J. be placed in father's care on family maintenance services and mother be granted reunification services.

At the initial jurisdiction/disposition hearing conducted on November 12, 2024, father requested N.J. to be placed with him. Mother had no objection but indicated she was contesting jurisdiction. The court ordered N.J. to be placed with father "with the understanding that if jurisdiction is dismissed, or not established, then she comes back to mom." The juvenile court expressed concerns that mother and J.S. were attending visits together because it believed there was a restraining order protecting mother from J.S., but J.S. confirmed it had been modified. The juvenile court then noted it did not want J.S. "to be involved in [N.J.]'s visits" with mother "[b]ecause of the allegations." The court set the matter for a contested hearing.

On November 13, 2024, N.J. was placed with father. She adjusted well to the placement and reported feeling safe, comfortable, and happy. She continued to attend visits with mother, which also generally went well. Father reported N.J. would get emotional after visits. He also reported she sometimes got scared and hid when she was asked not to do something and sometimes displayed attention seeking behaviors. He advised he was seeking mental health counseling for her. Mother continued to participate in services. As of January 24, 2025, the department continued to recommend reunification services for her and maintenance services for father, noting mother "needs to address the substance use issues in order to provide regular care to her children."

The jurisdiction hearing was conducted on January 27, 2025. Mother and father waived their rights to a hearing. The juvenile court found N.J. and her siblings were described by section 300, subdivision (b).

7.

As for disposition, mother requested a continuance. Her attorney advised the court mother had completed inpatient substance abuse treatment and was going into sober living the following day. She had completed most of her parenting classes and had not tested positive for any drug. She wanted the department to assess her home for a possible family maintenance recommendation. The department joined in the request for a continuance as to N.J.'s siblings' cases to evaluate mother's living situation. The department, however, stated it was prepared to go forward on N.J.'s case as she was placed with father, with the understanding that father would be requesting that the case involving N.J. be dismissed with custody orders. Mother requested N.J.'s matter be continued with the other children's because N.J. was not yet a dependent child, and the department still had the burden of showing clear and convincing evidence of detriment before N.J. was removed from her custody. The court granted the continuance as to all children since mother was doing well and was "on the cusp really of having the children back." The court granted the department's request to release N.J.'s siblings, but not N.J., to mother's care.

N.J. continued to do well in father's care. Father reported N.J. was having frequent angry outbursts when she first started living with him, but they had decreased. N.J. reported liking living with father, and the social worker observed that N.J. was very attached to father.

The social worker conducted a home inspection of mother's sober living facility and reported no concerns. Mother reported she ended her relationship with J.S. around November 2024 because she did not see him taking the same initiative as her in getting the children returned. She completed most of her parenting classes, inpatient substance abuse treatment, as well as an anger management course. Mother continued to test negative for drugs. In its supplemental report dated March 4, 2025, the department changed its recommendation to family maintenance services for both mother and father.

At the continued disposition hearing conducted on March 6, 2025, the department clarified that the recommendation was that all three children be returned to mother's care, and that I.S. and J.S. be removed from J.S.'s care. Mother agreed, as she contended there was not sufficient evidence to show detriment, and she was "very open to substantial visitation" with father. Father was contesting the change in recommendation and testified on his own behalf.

Father testified that N.J. had behavioral issues when she was first placed in his care and expressed fear of being left behind. Her behavior had since improved, and they work on deep breathing and grounding techniques, as well as prayer and meditation. Father was aware of the sexual abuse allegations against J.S. N.J. recently started therapy and attended twice per week. Father further testified that while waiting for the case to be called, father witnessed mother and J.S. sitting next to each other "holding hands and kissing," and "[t]hey seemed like a couple to [him]."

In response, mother testified that she had not been in a relationship with J.S. for three months. She sat next to him while waiting for the case to be called but did not kiss or hug him; she was just showing him videos of the children on her phone, and they were laughing.

During her testimony, the juvenile court asked mother if she was aware N.J. had accused J.S. of sexually abusing her, and mother responded, "No, this came from my mother." She went on to say that the maternal grandmother was the one that reported N.J. made the allegation, and mother took it seriously but did not believe it. She took N.J. to a SART exam and it "came back clear." When mother asked N.J. about it, N.J. said, "No, no. Well, maybe." Mother just let it be at that point and decided the best course of action was to not be around J.S., as he was living in a different town at the time. Mother added that when she was younger, the maternal grandmother had her say things about people "that weren't necessarily true."

J.S. also testified. He said that he sat with mother while waiting for the case to be called but did not kiss her; he just leaned in and looked at the videos she was showing him. He co-parents with mother, and the only contact he had with her was regarding the children.

County counsel asked the juvenile court to follow the recommendations. She argued mother had made good progress and was willing to comply with any orders to keep J.S. from the children. Mother's counsel echoed county counsel's arguments.

Father's counsel asked the court to remove N.J. from mother's custody, noting her long history with substance abuse and need of a program in order to maintain a stable lifestyle. Father's counsel expressed concern with mother's ability to maintain a safe environment with family maintenance without stricter supervision. He argued mother failed to show protective capacity with regard to N.J.'s disclosure of sexual abuse. Father's counsel argued that substantial danger existed based on mother's relationship with J.S., and "the only way to alleviate those concerns is to see if the mother will actually take these concerns seriously, actually separate from [J.]S." He opined that the only reason they were not together was that because her sober living facility did not allow it. Father requested custody of N.J., either with jurisdiction dismissed or kept open.

J.S.'s counsel again requested visits with N.J. As to the sexual abuse allegations, J.S.'s counsel stated that J.S. had not suffered any criminal charges and there was "simply no evidence that that happened."

N.J.'s counsel joined in the department's recommendations. He noted "[t]he allegation of sexual abuse is concerning but there are no criminal charges filed. Mother did get a SART exam. She distanced herself from [J.S.]" Counsel argued that he did not think there was a substantial risk of harm for N.J. in mother's care and that she "has done everything she could do to mitigate any substantial risk." The juvenile court questioned N.J.'s counsel on when the last time he talked to N.J. was, and he said September 27, explaining he "could not discern her wishes. She was unable—I was unable to do this,

10.

basically, because of her age. And I don't understand how the Department was able to communicate with her as much as they say they have."

In rebuttal, county counsel said the petition alleged a "(b) allegation for substance abuse. This is not a domestic violence, nor is there a sexual abuse allegation. There was those initial referrals, I believe it was back in March. Nothing has come up of that. I think it was inconclusive. Law enforcement didn't—there's not additional follow up with law enforcement in terms of charges that have been filed against [J.]S."

In ruling, the juvenile court stated that N.J. was situated differently from her siblings because of the sexual abuse allegations. The court noted it was "very impressed with mother," in terms of obtaining sobriety and a safe place for the children and was "doing very, very well right now." The court went on to say mother had "some credibility issues," and "What she said about [N.J.] today on the witness stand is that she questioned [N.J.] once and then didn't want to ask anymore questions when [N.J.] said, no, well maybe. And then yet the report clearly says, she questioned her seven or eight times, missed two SART exams, and [N.J.] did make the allegation back then." The court went on, "So I'm concerned about mother's ability to protect [N.J.], if this is her reaction to this. The fact that it's not a domestic violence allegation or a sexual abuse allegation doesn't mean I can't consider that that happened. I have to make sure that the child's safe." The court noted there was a criminal protective order keeping J.S. from N.J., which county counsel confirmed.

The juvenile court further noted that because it felt mother had credibility issues, it was crediting father's observations of her and J.S. in the waiting area. The court concluded, "So because of the sexual abuse of [N.J.], which I do find is a real risk and a real problem, and because of the credibility issues, I'm not going to follow the family maintenance recommendation for [N.J.]"

The juvenile court found there was clear and convincing evidence of a substantial danger to N.J.'s physical health, safety, protection, or physical or emotional well-being if

11.

she were not removed from mother's custody, there were no reasonable means to protect N.J.'s physical health without removal, and that the department had made reasonable efforts to prevent removal. N.J. was ordered removed from mother's physical custody "based on the facts set forth in the sustained petition, the report of the social worker and evidence presented." N.J.'s siblings were placed with mother, and N.J. was to remain placed with father.

Mother was ordered to participate in reunification services with regard to N.J., including counseling for parenting/child neglect, and failure to protect, as well as random drug testing.

## DISCUSSION

### I.      Findings Underlying the Removal Order

#### A.      Legal Principles

Once the juvenile court determines a child is described by section 300, it must then hear evidence on the question of the proper disposition. (§ 358, subd. (a).) The court must receive in evidence, read, and consider the department social worker's report, any study or evaluation by an appointed child advocate, "and other relevant and material evidence as may be offered[.]" (§ 358, subd. (b)(1).) The department's report must include, as relevant here, a "factual discussion" of various subjects, including "What plan, if any, for return of the child to the child's parents and for achieving legal permanence for the child if efforts to reunify fail, is recommended to the court by the county welfare department[.]" (§ 358.1, subd. (b).)

The juvenile court must declare the child a dependent unless the severity of the case warrants only informal supervision. (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.) When, as here the court declares the child a dependent, section 362, subdivision (a) gives the court the authority to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child[.]"

12.

A dependent child shall not be taken from the physical custody of his or her custodial parents unless, as relevant here, the juvenile court finds clear and convincing evidence that: "[(1) t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and [(2)] there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's … physical custody." (§ 361, subd. (c)(1).) The court must also determine whether the child welfare department made "reasonable efforts… to prevent or to eliminate the need for removal of the minor from their home[.]" (§ 361, subd. (e).)

### B.     The Juvenile Court's Findings Underlying the Removal Order Are Supported by Substantial Evidence

We review the juvenile court's dispositional findings for substantial evidence, bearing in mind the clear and convincing standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) The question before us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Ibid*.) We "view the record in the light most favorable to the [judgment] and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id*. at pp. 1011–1012.)

When determining whether a child will be in substantial danger if permitted to remain in the parent's physical custody, the juvenile court must consider, "not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)

We conclude the juvenile court's substantial danger finding was supported by substantial evidence. The court reasonably concluded that mother posed a risk of substantial danger to N.J. by failing to protect when learning of the sexual abuse

allegations and her lack of credibility concerning those allegations and her current relationship with J.S. The uncontroverted evidence before the court from the reports is that N.J. had disclosed only six months before the dependency proceedings were initiated that J.S. sexually abused her, and law enforcement initiated an investigation that included a forensic interview and a SART examination that remained open in part because it had not completed an interview with J.S. No evidence was ever provided to the court that this investigation had been closed, despite the department reporting early in the proceeding that they would follow up with law enforcement, and there still appeared to be a criminal protective order in place at the time of the disposition hearing. While mother testified she initially took the allegations seriously by asking N.J. about them, she also stated in no uncertain terms that she did not believe them. Rather, she attributed the allegations to the maternal grandmother, which the juvenile court did not find credible, as reports stated that N.J. personally reported both to the maternal grandparents and mother. Mother's testimony demonstrated a dismissal of the sexual abuse allegations and a lack of protective capacity against potential sexual harm perpetrated against N.J. by J.S. The court credited father's testimony that mother and J.S. appeared to be in a romantic relationship, and J.S. consistently sought visitation with N.J., including requesting unsupervised visitation at the disposition hearing. Given these circumstances and the juvenile court's finding that mother lacked credibility, the juvenile court reasonably concluded the risk of harm still existed. We reject mother's argument that we should dismiss the juvenile court's evaluation of the testimony and disregard its clear credibility findings.

The juvenile court's finding that there were no reasonable alternatives to removal was also supported by substantial evidence. While, as the juvenile court highlighted, mother had participated in services and was doing well with regard to her substance abuse issues, her testimony unequivocally denying sexual abuse had occurred when there was no evidence the criminal investigation had resolved and her credibility issues

14.

surrounding the issue supported the juvenile court's finding that removal was necessary. As mother points out, the agency recommended less restrictive alternatives, such as family maintenance services, but there is no evidence in the record that the juvenile court failed to consider them. To the contrary, the court's return of N.J.'s siblings to mother demonstrates the court was aware of the options before it. However, since the court did not find mother credible in terms of mother's relationship with J.S., the court could reasonably conclude that family maintenance services were not appropriate to protect N.J. from J.S.

We reject mother's argument that the department failed to make reasonable efforts to prevent removal by failing to offer "sex abuse awareness counseling" or that the court's failure to do so rendered the proceedings fundamentally unfair and constituted "structural error." Mother has not cited any authority to support that this constituted "structural error." Further, mother's claims appear to be premised on the incorrect assertion that the court ordered her to complete sexual abuse counseling at the disposition hearing,[4] but this does not appear to be accurate. Only J.S. was ordered to participate in counseling for sexual abuse as a perpetrator. Mother has not explained how "sex abuse awareness counseling" would have helped prevent removal of N.J. from her custody. To the extent that mother feels counseling beyond what she has been ordered to participate in is required, she may request it and, if not offered it, object at the next review hearing to a finding that reasonable services have been offered.

We also reject mother's assertion that the juvenile court did not sufficiently consider that the order removing N.J. would also separate her from her siblings. As

---

[4]     Mother asserts her case plan included "sex abuse awareness counseling," and "the juvenile court … refus[ed] to return the child to [m]other because she had not completed counseling that was never required, suggested, or recommended." The pages mother asserts support her claim that "sex abuse awareness counseling" was included—pages 506 to 508—are not included in the record on appeal, and we cannot find support in the record for mother's claim.

15.

father points out, nothing in section 361, subdivision (c) makes keeping siblings together a factor to consider when determining whether a parent's home poses a substantial danger to the well-being of a child. We acknowledge that it is a factor to be considered by a court determining whether to place a child with a noncustodial parent, but mother does not challenge the court's finding that placement with father would not be detrimental to her. N.J. had been living with father for approximately three months, and there was no evidence she was suffering detriment in not being placed closer to her siblings.

### C. The Juvenile Court Was Not Required to Base Its Removal Findings Solely on the Allegations Pled in the Petition

Mother's arguments that the evidence was insufficient to support the juvenile court's findings are primarily premised on the fact that the sexual abuse allegations were not pled nor proven as jurisdictional allegations. We reject this premise and all of mother's arguments which rely on it.

Mother does not cite any evidence to support her general assertion the court could not rely on evidence that was not included in the petition to support a finding of substantial danger to determine the appropriate disposition. Rather, to support her assertion that "A dependency court may not sustain a removal order based on allegations that were neither pled in the petition nor litigated at the jurisdictional hearing," she cites *In re Gino C.* (2014) 224 Cal.App.4th 959. *In re Gino C.* does not stand for this assertion and is inapposite. In *In re Gino C.*, the appellate court held the juvenile court did not comply with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) before taking subject matter jurisdiction over the matter. It notably did not address the parents' contentions the court erred in making placement decisions. (*In re Gino C.*, at pp. 961–962.)

Moreover, relevant by analogy is the juvenile court's authority to order removal and denial of custody of a dependent child from parents who have no jurisdictional allegations pertaining to them at all. (See §§ 361, subd. (d) [authorizing removal from

16.

noncustodial parents upon a finding of substantial danger] & 361.2 [authorizing denial of placement with a noncustodial parent upon a finding of detriment].) In fashioning a dispositional order, " 'The problem that the juvenile court seeks to address need not be described in the sustained section 300 petition. [Citation.] In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order.' " (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1148.) It follows that the court may make dispositional findings and orders arising from issues not described in the jurisdictional allegations, even when jurisdictional allegations are made as to that parent. As such, we reject mother's general assertion that the court was not permitted to base its removal order upon facts not set forth as jurisdictional allegations in the petition.[5]

### D.      *Mother Has Not Demonstrated Due Process Violations*

In addition to arguing the court was simply not permitted to rely on information related to the sexual abuse allegations, mother asserts that by doing so, the court improperly amended the jurisdictional pleading and acted in the role of a prosecutor or advocate, violating mother's due process rights to an impartial arbiter and notice of the nature of the allegations pertaining to her. Mother's arguments that her due process rights were violated are not well taken.

At the time of the dispositional hearing, the court already had assumed jurisdiction over N.J., based on not only mother's substance abuse, but her "failure or inability … to supervise or protect the child adequately." Mother notably does not challenge any sustained jurisdictional allegations, assert the petition was insufficient on its face, or that the court erred in any way by taking jurisdiction over N.J. or declaring her a dependent

---

[5]      We recognize removal from or denial of placement with noncustodial parents is distinguishable from removal from a custodial parent because it allows for a court to rely on emotional well-being rather than physical harm (see *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425), but here, the risk to N.J. was physical as it involved the risk of sexual abuse.

child.  Mother only challenges the portion of the dispositional order removing N.J. from her physical custody.  We acknowledge that the department did not specifically allege that mother's conduct constituted a risk to N.J. regarding sexual abuse by J.S.; however, as we have stated, she does not cite any authority that the juvenile court was required to base its finding of substantial danger based solely on facts pled in the petition.  While, as mother points out, the court is not permitted to assume a prosecutorial role (see *In re Emily D.* (2015) 234 Cal.App.4th 438, 445–446), the court is not required to follow the department's recommendation as to disposition or related findings and orders (see *In re J.F.* (2014) 228 Cal.App.4th 202, 210 [juvenile court not bound by department's recommendation even when department bears the burden of proof]).

Because jurisdiction was properly taken over N.J. and is unchallenged, and the juvenile court has broad discretion to make dispositional orders, mother has not demonstrated any due process violations.

We also reject mother's brief suggestion that the juvenile court ever made any finding that the evidence supporting the sexual abuse allegations was not sufficient to support jurisdictional findings by a preponderance of the evidence.  The record simply does not support such a suggestion.  In any event, the sworn testimony presented at the disposition hearing, including mother's, in addition to the evidence contained in the department's reports, constituted clear and convincing evidence supporting the juvenile court's dispositional findings.

For the above reasons, we conclude mother has failed to show any of her due process rights were violated.

## II.    ICWA

Mother argues the court's finding that ICWA did not apply to the proceedings was error because the department (1) was obligated to follow up on the maternal step-grandfather's claim of affiliation with a non-federally-recognized tribe and (2) failed to

include all paternal relatives in the communication sent to tribes in response to a paternal claim of Cherokee ancestry. We disagree.

While the California Indian Child Welfare Act (§ 224 et seq.) (Cal-ICWA) requires inquiry to begin as soon as a child welfare department begins making contact with a family (see § 224.2), formal notice to relevant tribes is only required when the department is seeking foster care placement or termination of parental rights (§ 224.3; see 25 U.S.C. § 1912(a)).

Here, N.J. is placed with father, and the department was recommending placement with mother, with both parents receiving family maintenance services. At this juncture of the case, the department is not seeking N.J. be placed in foster care or that parental rights be terminated. Therefore, any error in inquiry at this juncture in the present case is harmless. (See *In re Alexis H.* (2005) 132 Cal.App.4th 11, 14.)

We rest assured that the department and the juvenile court will continue to fulfill their continuing and affirmative duties of inquiry under Cal-ICWA (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court, rule 5.481(a)). Mother is encouraged to raise her concerns with the juvenile court, so the juvenile court has the opportunity to evaluate her claims in the first instance and make appropriate findings and orders as to whether the department has conducted an adequate inquiry.

## **DISPOSITION**

The juvenile court's dispositional findings and order are affirmed.


                                            DESANTOS, J.

WE CONCUR:


FRANSON, Acting P. J.


MEEHAN, J.